Filed 2/3/15   P. v. Dobson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060270 |
| v. | (Super.Ct.No. RIF1202530) |
| RANDY KENNETH DOBSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas Kelly, Judge. (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Randy Kenneth Dobson pled guilty to arson of an inhabited structure (Pen. Code, § 451, subd. (b)),[1] presenting a false insurance claim (Pen. Code, § 550, subd. (a)(1), presenting a false statement in conjunction with an insurance claim (Pen. Code, § 550, subd. (b)(1)), possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), and possession of drug paraphernalia (Health & Saf. Code, § 11364.1). The trial court imposed the maximum it said it would consider, which was eight years in state prison. Defendant orally moved to withdraw his guilty plea, but the trial court denied the request. His sole contention on appeal is that this act constitutes an abuse of discretion. We disagree and affirm the judgment.

## FACTUAL[2] AND PROCEDURAL BACKGROUND

On December 26, 2011, a fire broke out at a mobilehome owned by codefendant Lori Jo Alhadeff.[3] The Riverside County Fire Department extinguished the blaze. California Department of Forestry and Fire Prevention conducted an investigation in which it concluded that two people had been present in the residence prior to the fire. It

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] Because defendant pled guilty at the preliminary hearing, no fact-finding proceedings occurred at the trial court. We therefore follow the practice of both parties to this appeal and derive our summary of the facts of the underlying offenses from the probation report.

[3] The People alleged against Alhadeff the same counts to which defendant pled guilty, although they also charged Alhadeff (but not defendant) with misdemeanor resisting arrest (§ 148, subd. (a)(1)). Alhadeff pled guilty to all counts alleged against her on the same day defendant pled guilty to all counts alleged against him. Information about her sentencing is not available in the record on this appeal.

2

determined that the fire was the result of arson. Investigators found a glass pipe often used for smoking methamphetamine, which contained a white crystalline substance. Alhadeff claimed the pipe belonged to her friend, Randy.

Defendant, whom Alhadeff described as a "casual fling," arrived at the scene of the fire on the day it occurred. When questioned by investigators, defendant stated he had been at Aldaheff's residence the day before the fire but insisted he was only there for a couple of hours in the afternoon. He denied that the pipe belonged to either him or Alhadeff. He asserted he "wasn't anywhere near" Alhadeff's mobilehome when the fire began and was instead at a friend's house playing ping-pong. After indicating that someone must have caused the fire but he did not know who, defendant told investigators: "More importantly, what's going to happen with the insurance company, what are they going to say?"

In addition to appearing at the scene of the fire and speaking to investigators, on the day of the fire defendant also left "several urgent messages" with Alhadeff's insurer indicating that her house had burned down but that she was "too upset to call." Approximately an hour after an insurance representative told defendant she could not answer his questions because he was not on the policy, defendant and Alhadeff appeared at the insurer's office to file a claim. Defendant gave the insurance agent a binder containing a copy of the policy; someone had already highlighted sections containing information about payouts, deductibles, and personal property. Defendant prompted Alhadeff to ask questions about valuing the claim at $554,000. He interrupted the

insurance agent's questions about the fire to ask, "You don't know it's not illegal to burn your own house down[?]"

Suspicious of the fire's origin, the People obtained and executed a search warrant for defendant and Alhadeff's hotel room, as well as the latter's vehicle and residence was issued. Among other items, officers seized "a document strategizing the insurance fraud, in what appears to be [defendant's] handwriting"; glass pipes; a substance that later field-tested positive for methamphetamine; correspondence between defendant and Alhadeff "detailing how to execute the plan to obtain the insurance claim"; and a binder and folder containing insurance paperwork. At some point during the investigation, law enforcement even discovered "a lighter engraved with what is believed to be the inception date of the arson scheme."

Once in custody and *Mirandized*[4] defendant admitted that he had helped Alhadeff with her insurance claim because she was "not very smart" and he had experience in handling similar claims because of a house fire. Defendant ended the interview after being informed that none of his answers would get him automatically released.

During the investigation, two of Alhadeff's neighbors confirmed that defendant had been at their house until shortly before the fire broke out. Approximately two weeks after the fire, defendant asked them to sign a letter stating that he was at their residence until three hours after they say he left. The neighbors declined the request.

---

**4** *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

The People initiated this case against defendant and Alhadeff on June 6, 2012. At the preliminary hearing on March 1, 2013, defendant entered a plea of guilty on all counts. Defendant executed a plea form explicitly stating that the maximum sentence he could serve was 11 years two months, that his entitlement to formal probation would be "decided by the court," and the term he would serve in custody would not exceed eight years in state prison.

At the beginning of the hearing, the trial court stated: "I indicated a[n] eight-year maximum sentence for the two defendants, and just where it would be, I don't know. I need to find out more about each of you. I'd be wanting a probation report and hear from all the attorneys, including the prosecutor, to decide what's appropriate." RT 1.} When the court first asked defendant if there were "[a]ny other threats or promises other than that?" he initially replied, "Yes, sir." The court then repeated the question, which defendant answered with, "No, sir. No, sir." Defendant told the court that he had a "clear mind" and understood what was happening, he understood that a conviction would violate any probation or parole from previous cases, and he had no questions about the plea form he had executed. When the prosecutor asked if he had committed the acts alleged in each count, he answered, "Yes." In defendant's presence, the trial court, the prosecutor, and defense counsel discussed his maximum sentence if he were convicted after trial and agreed that, as the plea form stated, it was just over 11 years. The court again indicated that eight years was its "theoretical maximum" and explained that "if [it was] to back off from that, feel more than eight years was required, [defendant] would have the right to withdraw [his] plea." When asked if he understood, defendant said

5

simply, "Yes, Your Honor." Next, the court asked, "Given our discussion, how do you plead, Mr. Dobson, to each of these counts?" Again without questions or caveats, defendant answered, "Guilty, Your Honor."

After taking defendant's plea at the preliminary hearing, the court set sentencing for May 17, 2013. Defendant did not appear, and a bench warrant issued.

On June 12, 2013, the trial court filed a letter[5] defendant had written to the trial judge indicating that he had not appeared "because this case has been packed with police misconduct and attorney misconduct and would have sent me straight to prison where [he would be] unable to fight for what is true and correct." He then asserted that defense counsel promised him probation, with no more than one year in jail if he pled guilty, and that "state prison ha[d] been removed from the table." Because counsel allegedly lied to the court when discussing the terms to which defendant agreed, defendant accused him of committing perjury. He also told the judge "it makes no sense" that he would plead guilty "unless something fantastic was on the table" and suggested that he could be found guilty of no more than liability for "accessory after the fact," a misdemeanor, because he was not at the scene of the crime.

In the letter, defendant requested "some means by which [he could] address the court without fear of incarceration prior to having been heard," and he indicated he would

---

[5] The letter is curiously dated May 16, 2013, which was the day before the sentencing hearing, but it states that defendant failed to appear "last Friday." The record on appeal contains no explanation for this discrepancy, resolution of which is irrelevant to the issues on appeal.

"comply with any request your honor should make of [him]." The trial court took no action on the letter, other than to have it retained in the file in case it became relevant.

The parties appeared for sentencing on September 25, 2013. The record on appeal does not indicate why, but the court set a hearing for a *Marsden*[6] motion to replace appointed defense counsel for October 3, 2013. It also ordered, for the court's own use, a transcript of the hearing at which defendant changed his plea.

On October 3, 2013, the trial court began proceedings by stating, "This is a *Marsden* hearing." Defense counsel explained that he and his client were present because defendant had indicated "he wished to explore withdrawing his plea" on the ground of ineffective assistance of counsel. Therefore, counsel "felt it was [his] duty and obligation to notify the Court of that concern that Mr. Dobson had and to ask the Court to schedule a *Marsden*/*Sanchez*[7] hearing, and that's why we're here today."

The floor then belonged to defendant, who gave several pages of testimony about his dissatisfaction with counsel's handling of the case. He repeated the accusation from his earlier letter to the trial judge that defense counsel had actually promised him only "365 days in county jail with half," which counsel said the judge, who was "the most lenient . . . in the building," would probably waive. According to defendant, "those were

---

**6** *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

**7** *People v. Sanchez* (2011) 53 Cal.4th 80, 84 (*Sanchez*) (trial court must conduct *Marsden* hearing when defendant provides "some clear indication" that he wishes to substitute appointed counsel in conjunction with a claim that existing counsel offered inadequate assistance in connection with a guilty plea).

7

the exact terms," and counsel "would be committing perjury" if he stated otherwise;[8] in fact, defendant offered to undergo a polygraph examination to prove his own veracity. Defendant complained that he did not have his eyeglasses at the preliminary hearing, but that defense counsel assured him that he should sign the plea form, anyway, because it simply offered what had been promised. Defendant also alleged that he had been "granted just minutes to decide [his] fate[]" and suggested it "was completely without feasibility" that he "would knowingly, nor would anyone, in [his] opinion, plead guilty on all counts, decide in a matter of minutes to do so, and sign literally blindly a plea agreement form that for all intents and purposes would guarantee . . . a minimum of five years in state prison."

Defendant's testimony began with his version of what defense counsel told him the plea agreement was, and in the course of his statements he hypothesized that Alhadeff would agree to his suggestion about conducting a bench trial, "as she would also be granted the right to change her plea to not guilty." Defendant also made statements indicating that he wished to have "the opportunity" to change his plea.

Defendant lodged complaints about counsel's representation that were unrelated to the plea agreement, such as that counsel refused to address the allegation that the lead fire department investigator had committed perjury in a warrant application, that he failed to attend defendant's presentencing interview with the probation officer, and that his

---

**8** In fact, defendant accused the entire Public Defender's office of conspiring to railroad defendants into taking bad deals and invited the trial court "to investigate the last two or 300 cases" from that office in order to uncover "a pattern of this type of deception."

requests to see discovery went unanswered.   In addition, defendant leveled accusations against his probation officer. The vast majority of his speech, though, centered around the circumstances of his pleading guilty.

After defendant finished talking, the trial court again directed its attention to defense counsel.  Before counsel could respond, the trial court interrupted to say that it had read the transcript from the preliminary hearing and confirmed that it had given no more than a promise that defendant's confinement, if any, had not yet been determined but would not exceed eight years.  After a brief recess and an opportunity to read the transcript, defense counsel agreed with the court's assessment.

Counsel then stated he "did want to address a couple of Mr. Dobson's concerns" and began proceeding in chronological order.  After addressing various complaints defendant had made about the representation, counsel read an email he wrote to defendant in which he explained that defendant could make a plea to court, that the judge was likely to provide a ceiling that the actual sentence would not exceed, that a probation report would probably be ordered, and that even after the report was provided the judge could impose the ceiling as defendant's sentence.

After this testimony, defense counsel provided a lengthy description of events preceding defendant's entry of a guilty plea.  As defendant expected, his counsel said he had told defendant that there was no guarantee of probation, that the judge had made no promises other than that defendant's sentence would not exceed eight years, and that the court would need to hear from probation before reaching a decision.  Defense counsel also stated he told defendant that, even though he was something of a "derivative player,"

9

there was "a lot of very damning evidence in the case" in the form of documents in defendant's own handwriting establishing his role in the arson scheme. Counsel then testified that he "went over th[e plea] form line by line with" defendant, and that the form also indicated that the court would determine defendant's actual sentence at a later time.

Proceeding chronologically, counsel next returned to responding to particular criticisms defendant had made about his handling of the case. He explained that he had intended to attend defendant's presentencing interview with probation but could not be there because he was in trial. Counsel also provided a thorough[9] account of his email correspondence with defendant about various topics not relevant to this appeal.

In the midst of this explanation, defense counsel also described email exchanges with defendant regarding the sentence he was likely to receive. In these, he told defendant that he would likely receive formal rather than informal probation, if he received probation at all, that he would likely receive one year of county jail time, and that he "need[ed] to prepare [him]self for the possibility" that he could spend eight years in state prison.

Defense counsel testified that, in the weeks after this email conversation, he received letters from defendant indicating dissatisfaction with the quality of representation. According to counsel, this was the first time defendant mentioned wanting to withdraw his plea. Defense counsel perceived that defendant wanted to make such a request due to a belief that his representation had been inadequate, but counsel

---

[9] In fact, the trial court referred to him as "the most thorough attorney in the building."

10

also thought he had done a competent job on the case. Therefore, counsel "would not be bringing a plea withdrawal motion, because [he] didn't feel that was reasonably meritorious." Instead, defense counsel explained to defendant the procedure for withdrawing a plea and told defendant he had the right to make a *Marsden* motion, to hire a private attorney, or to represent himself as authorized by *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

The trial court then repeated that it had reviewed the transcript from the preliminary hearing and concluded that defendant received oral advisements that he could face eight years in prison. The court quoted its previous statements to defendant about how it needed more information before making a sentencing decision, and it read defendant's answers to questions about whether he was knowingly and willingly pleading guilty. The trial court told defendant he had the burden of proving that his counsel had rendered inadequate assistance "on these *Marsden* motions," that it had to make credibility determinations when "[it] do[es] these *Marsden* hearings," and that it had concluded that defense counsel's version of events was more credible. Before discussing scheduling with defense counsel, the court stated it was "denying the *Marsden*."[10] It made no explicit rulings on a request to withdraw defendant's guilty plea on the day it considered defendant's *Marsden* motion.

On October 4, 2013, the day after the above-summarized hearing, defendant filed a *Faretta* waiver. He appeared on his own behalf at a sentencing hearing on that date and

---

[10] The minute order from the October 3, 2013, hearing also indicates that the court did no more than deny a *Marsden* motion.

11

requested and obtained a continuance "to research plea withdrawal." However, the record on appeal contains no indication that defendant, once self-represented, again raised the issue of withdrawing his plea.

The parties appeared for sentencing on November 15, 2013. The court started by indicating that it had put the hearing over so defendant could prepare. Defendant responded that he had been unable to "file a motion" because he had been denied access to the law library. He concluded by saying, "So I guess we just move to sentencing, I guess." The prosecutor asked the court to reconsider its eight-year ceiling because, given that defendant had lodged formal complaints about investigators from the Fire Department and the insurance company in an apparent attempt to evade liability, "[t]his defendant is the most calculated, mischievous, and evil individual [she] ha[d] ever seen." When the court asked if defendant had anything to say, he answered, "No. No response." Defendant said nothing when the trial court imposed the maximum term it had offered, and he said he did not disagree with any of the restitution amounts.

Near the end of the proceeding, the trial court advised defendant of his right to appeal. It then stated: "And, as you recall, I did get a transcript of the plea that we took. I wanted to make sure that the plea was appropriately taken. I was satisfied it was or I would have granted your request. But who knows? The higher courts may disagree with my call on that. So you've got that remedy if you choose to pursue it. Okay?" Defendant answered simply, "Yes."

Defendant, representing himself, filed a timely notice of appeal. The trial court granted his request for a certificate of probable cause.

12

In the first section, we reject the Peoples' contention that defendant forfeited the right to appeal the denial of a request to withdraw his plea because he never actually made such a request. The remaining section discusses defendant's unsuccessful contention that the trial court abused its discretion in refusing to let him change his guilty plea.

### 1. Defendant did not waive the right to appeal

The People argue defendant forfeited the right to challenge the supposed denial of his motion to change his guilty plea because he never expressly made a motion requesting such relief. They emphasize that defense counsel stated during the October 3, 2013, hearing that he would not file a motion to withdraw the guilty plea because he deemed it unmeritorious, and that defendant never made such a motion once he began representing himself.

The rule is that the denial of a motion is waived on appeal if the motion was never made or, if made, was never denied. (*People v. Turner* (2002) 96 Cal.App.4th 1409, 1412-1413 [motion not made]; *People v. Brewer* (2000) 81 Cal.App.4th 442, 461 [no ruling on motion made].) While defendant's counsel expressly disclaimed making a motion to withdraw the guilty plea because he felt it would not be meritorious, the vast majority of what defendant discussed when speaking to the court concerned the circumstances of his pleading guilty, and defense counsel spoke at length about his version of what happened in this regard. In fact, Defendant made the following explicit statements: (1) "With all due respect, Your Honor, if—it would seem that based upon

13

these facts, my codefendant and myself should both be granted the opportunity to change our pleas to not guilty. We would then retain private counsel and proceed to trial, or in pro[.] per[.] if that's appropriate"; and (2) "I would beg that Your Honor would grant my codefendant and myself the opportunity under these unique circumstances to change our pleas to not guilty." Also, defendant's letter to the trial judge requested an opportunity to discuss his concerns about his plea.

As we indicated *ante*, the transcript from the hearing on October 3, 2013, was silent about whether the court would allow withdrawal of the guilty plea even though it denied the *Marsden* motion. At the next hearing, while representing himself, defendant requested a continuance to research withdrawing his plea, but he never made a formal motion regarding his guilty plea.

However, when discussing defendant's right to appeal the judgment, the court stressed that it had reviewed the "transcript of the plea," determined "that the plea was appropriately taken," and used that conclusion to deny defendant's "request." In addition, the trial court granted defendant's request for a certificate of probable cause. This act is in keeping with the trial court's statements to defendant that he could appeal, and that "The higher courts may disagree with [its] call" on the taking of defendant's plea. Because the trial court appears to have considered itself to have heard and denied an oral motion by defendant to withdraw his guilty plea, we see no reason to find that defendant waived the right to appeal by failing to move to withdraw his guilty plea or to obtain a ruling on that request.

14

## 2. *The trial court did not abuse its discretion*

Defendant contends he should have been allowed to withdraw his guilty plea because: (1) he only had a few minutes to confer with trial counsel regarding his charges and possible defenses; (2) his statement that he was not at the scene of the fire constitutes proof of factual innocence; (3) he did not understand the plea terms; and (4) he could not read the plea form because he lacked his eyeglasses. We hold the trial court did not abuse its discretion in finding that defendant failed to prove by clear and convincing evidence that either contention provided good cause to withdraw his plea.

Section 1018 allows a court to permit the withdrawal of a guilty plea "for a good cause shown." "To establish good cause, it must be shown that defendant was operating under mistake, ignorance, or any other factor overcoming the exercise of his free judgment. [Citations.] Other factors overcoming defendant's free judgment include inadvertence, fraud or duress. [Citations.]" (*People v. Huricks* (1995) 32 Cal.App.4th 1201, 1208 (*Huricks*).) In addition, a defendant who had inadequate time to discuss the consequences of a guilty plea with counsel may be able to show that he was "improperly induced" to plead guilty. (*People v. McGarvy* (1943) 61 Cal.App.2d 557, 563 (*McGarvy*); see also *People v. Chesser* (1947) 29 Cal.2d 815, 820 [plea can be invalidated when the attorney who represented the defendant before entry of a guilty plea to a capital charge "has no knowledge of the facts of the case and does not counsel or advise the accused with respect to the charge against him"].) Of course, if a defendant has a valid defense to a charge against him, the defendant should be permitted to

withdraw a guilty plea. (See *People v. Ramirez* (2006) 141 Cal.App.4th 1501, 1507-1508 ["any defense at all should be sufficient cause to permit a change of plea"].) "However, '[a] plea may not be withdrawn simply because the defendant has changed his mind.' [Citations.]" (*Huricks*, *supra*, 32 Cal.App.4th at p. 1208.) Rather, a defendant moving to vacate a guilty plea bears the burden of showing, by clear and convincing evidence, "'[that] the ends of justice would be subserved by permitting a change of plea to not guilty.' [Citation.]" (*People v. Weaver* (2004) 118 Cal.App.4th 131, 146.)

On a contested motion to withdraw a guilty plea, the trial court acts as the trier of fact and must judge the credibility of witnesses. (*People v. Quesada* (1991) 230 Cal.App.3d 525, 533 (*Quesada*), superseded by statute on other grounds as stated in *People v. Totari* (2003) 111 Cal.App.4th 1202, 1206, fn. 5.) "[A] reviewing court must adopt the trial court's factual findings if substantial evidence supports them. [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1254 (*Fairbank*).) We will only disturb a trial court ruling on a motion to withdraw a guilty plea if we find an abuse of discretion. (*Huricks*, *supra*, 32 Cal.App.4th at p. 1208.)

In this case, defendant had ample opportunity to consider the terms of the deal the court offered him. He pled guilty nine months after initially pleading not guilty, and defense counsel stated that he and defendant "had discussed the case for months" before entry of a guilty plea Also, the trial court told defendant multiple times that he could serve up to eight years in state prison if he pled guilty. We see no clear and convincing evidence that defendant's plea was insufficiently knowing and voluntary. Each of

16

defendant's specific contentions about his request to change his plea fails for reasons we set forth *post*.

We are unpersuaded by defendant's contention that he lacked time to adequately consider the consequences of pleading guilty because he was only able to discuss the court's offer for a short period of time. In so arguing, defendant attempts to analogize his case to *McGarvy*, but that case is distinguishable. In *McGarvy*, the defendant was arrested for murder on one day and arraigned on the next. (61 Cal.App.4th at p. 559.) On the third day, he appeared in court with an attorney and entered a guilty plea to the charge of manslaughter. (*Ibid*.) Ten minutes later, and after conversing with the attorney about the facts of the case for only 20 to 30 minutes, he was sentenced on his guilty plea. (*Id*. at pp. 558, 560.) The attorney he spoke with was not even appointed to represent him; rather, the prosecutor had asked counsel "to at least talk to" the defendant. (*Id*. at pp. 560-561.) The trial court denied the defendant's motion to change his plea, and the appellate court reversed. (*Id*. at pp. 558, 565.) The appellate court concluded "that there was undue haste in the entire disposition of the case." (*Id*. at p. 561.)

*McGarvy* is inapposite. Here, defendant, represented by a deputy public defender making a special appearance, pled not guilty at his initial arraignment on June 12, 2012. The attorney he sought to discharge via *Marsden* motion began representing him as of at least June 21, 2012, when he appeared at a settlement conference on defendant's behalf. This lawyer told the court during the October 3, 2013 hearing that he and defendant had had "months" to discuss the case before entry of a guilty plea. In addition, and as discussed *ante* in greater detail, the trial court gave defendant specific advisements about

17

what his maximum sentence might be. Moreover, these advisements occurred on March 1, 2013, nearly nine months after defendant's original plea of not guilty. Unlike in *McGarvy*, there was no "undue haste" or improper inducement of a plea here.

Defendant's assertion that he cannot actually be guilty of arson because he was not present when the fire started is also unavailing. "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned *or who aids, counsels, or procures the burning of,* any structure, forest land, or property." (§ 451, italics added.) The People uncovered evidence that defendant handwrote instructions for Aldaheff to help her conflagrate her own residence, demanded a payout from her insurer even though he was not a beneficiary of the policy, and told an insurance agent that it was not illegal to burn one's own house down. He even made clear to investigating officers on the night of the fire that the insurance company's reaction was "[m]ore important[]" than the cause of the fire. Aldaheff's statement to investigators that defendant was "mad at" her because of the investigation also implicates defendant in planning the insurance fraud scheme. Here just as much as in the trial court, defendant offers no explanation regarding why these facts do not implicate him in arson as defined by section 451. Defendant also makes no attempt to deny that he possessed methamphetamine or related paraphernalia. Even if he had offered contradictory evidence, the trial court was not obligated to accept as true his version of events. The trial court did not abuse its discretion in rejecting defendant's claim that clear and convincing evidence showed his innocence.

18

Next, defendant's claim that he did not understand the plea terms fails. To the extent defendant contends he thought he would only receive probation and a possible one-year sentence to jail because his attorney misrepresented the deal, we note the trial court made an explicit finding that defense counsel's side of the story was better supported than defendant's. Once again, we accept the trial court's factual findings as true because they are supported by substantial evidence, given the transcript showing that the trial court itself orally advised defendant that he might not receive probation and could face an eight-year prison sentence. Thus, the trial court did not abuse its discretion in finding that defendant's plea was knowing and voluntary.

Finally, defendant insists it is inconceivable that he would have agreed to a deal he could not read because he did not have his eyeglasses. The presence or absence of glasses is irrelevant to defendant's claim, because the trial court gave careful oral advisements of all facets of the plea agreement as it existed at the time of the preliminary hearing at which defendant changed his plea to guilty. Defendant made no objection when the court informed him he could face up to eight years in state prison, and he asked no questions before stating, "Guilty, Your Honor," when asked what his current plea was. We fail to see what difference having his glasses would have made. In addition, defense counsel introduced proof that he had advised defendant in an e-mail that a plea to court may result in imposition of the ceiling the court established, which the court said was eight years in state prison.

Defendant's attacks on his guilty plea all fail for the reasons we provided. We discern no abuse of discretion in the trial court's denying defendant's request to withdraw his plea.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                                        P. J.

We concur:

McKINSTER
                    J.

MILLER
                    J.

20